Marriage of Mary Ellen Griffin, Appellant by Stephen Boddy v. Kevin Griffin, and Believed by Howard Levine. Mr. Boddy? May it please the Court,  Mr. Chairman, My name is Stephen Boddy and I represent Mary Ellen Griffin in this matter. The underlying matter is a petition to modify visitation. The trial court heard evidence. The trial court is not bound by the opinion and the trial court is not bound by the recommendations of the child's therapist, Ms. Diane Boxstaller. The trial court is not even bound by the child's wishes, but what the trial court is bound by is the evidence and what the trial court is obligated to do is not act arbitrarily against the overwhelming weight of the evidence. And that's what we're saying this trial court did. It was back in August, August 28th of 2008 that Mrs. Griffin filed her petition to modify the parenting time for the minor child. She was seeking a more traditional schedule. And the petition, which was the subject of some debate and I don't know why, was very clear that it was only seeking modification based upon the best interests of the child. Nowhere at any time in the petition was the word restriction used, serious endangerment used. Nowhere in the prayer for relief was that ever used. Nowhere in the trial was that ever used. The simple standard was best interests of the child. And I think when you look at this case, you have to start back with the evidence in 2005. This is when Diane Boxstaller began being the child's therapist. And if I remember upon reviewing the record, it was both Mr. and Mrs. Griffin that attended the first three visits with the minor child and Ms. Boxstaller. Well, Ms. Boxstaller continued to treat the minor child. And then in August of 2007, the minor child started telling Ms. Boxstaller. In fact, according to Ms. Boxstaller, it was on at least 12 different occasions that she wanted to change the visitation schedule. The minor child expressed, according to Ms. Boxstaller, a constant desire to change this schedule. And when Diane Boxstaller testified at the trial, she recommended that the visitation schedule be changed. And again, the court is not going to change the visitation schedule. What you have to do is look at all of the evidence. This is just one piece of the evidence. And I want to remind the court that Ms. Boxstaller was unimpeached, uncontradicted, and had been treating this child for four years. So she knew this little girl. Well, the court, after a few months in the case, appointed a Mr. Joseph Glimko as a guardian ad litem. He was appointed October 22, 2008. And Mr. Glimko had an opportunity that neither the trial court or anyone else had. Mr. Glimko actually had an opportunity to repeatedly meet with the parents and meet with the child. In fact, he testified that he interviewed the minor child on four different occasions. He interviewed the parents. He interviewed the fourth grade teacher, the principal, and he also had the opportunity to interview Diane Boxstaller, along with being present at the trial and being present through the whole process leading up to the trial, which includes depositions and discovery. He said that on the first meeting with this minor child, she told him, this is the GAL appointed by the court, that she wanted to change visitation. She gave her reasons. Pets, friends, the reasons at that time a nine-, ten-year-old girl would give. Well, Mr. Glimko, in doing his job, testified that he spoke to witnesses that make up the evidence that we have to listen to. And when he spoke to Diane Boxstaller, Diane Boxstaller told him that the child had indicated to her that she began having stomach aches before visits with her father. She told the GAL this. And she also told the GAL that these symptoms were associated with the child's guilt from being questioned by her father, from not wanting to spend as much time with her father as with her mother. So Diane Boxstaller, after speaking to Mr. Glimko and after Mr. Glimko testifying to this, she testifies. She testified that the minor child did not want to hurt her father's feelings and how this father questions the little girl about his love for him because she wants to spend more time with her mother than with her father. And the result of this is that the little girl feels guilty. So Mr. Glimko, as GAL, completes his investigation. And when he was examined at trial, he indicated, and I believe it was me questioning him, about his prior experience in parental coaching. He had it. I think GALs are trained for that. Diane Boxstaller, too. We have these two witnesses. Prior experience in parental coaching, trained in it, neither found that Mrs. Griffin had coached the minor child, although the GAL did find that both parents had influenced the child. We didn't expand upon influence. Maybe we should have, but we didn't. Influence the child is the word that they use. So the GAL now makes a more standard visitation schedule and gave reasons because these people live 25 miles apart. The girl is starting to get older. It's necessary for consistency, he said. It's necessary for stability, he testified to. He indicated that in his opinion as guardian attorney at Lightham, that the existing schedule was difficult and confusing to this little girl. And it was difficult for bonding with her parents and particularly difficult in allowing this girl to participate in extracurricular activities at the school she went to, which was 2.5 miles from mom's house. Now the court also heard the testimony of the parties, and both parties had nothing but good things to say about their relationship with the daughter, and that's expected in these custody visitation trials. But the court also had an opportunity to conduct an in-camera interview, and I think this was a perfect opportunity for the court to hear what this girl had to say. And I would remind the court, and the record is clear, that the motion for an in-camera interview was brought by the father, his attorney brought it. Well, the minor child told the judge the same thing that she's been telling the GAO and she has been telling therapists. She told the judge that she does not like the new visitation schedule, that most of her friends are at her mother's house. She also, the judge, inquired as to whether or not her mother talked to her. And the child indicated mother didn't talk to her about coming to the judge. In fact, it was a surprise to her that she was even there. But she did indicate to the court, to the judge. Again, the father will accuse her of wanting to be with mother more, and that shows that she does not love her father. Well, the court heard all this evidence, and when the court came down with the ruling, I looked at this ruling, and I really, really felt this was completely out of left field. It was completely contrary to the evidence that I heard at this trial. The court made some interesting comments. The first thing, the court accused the mother of taking actions not likely to encourage a relationship between the father and the minor child. For example, the court indicated that she listed mom, Mrs., her boyfriend as a stepdad on a school form, and you've all had the opportunity to look at the school form. They're filled out at every school. Mother, father. She listed herself. She listed Mr. Griffin. Emergency contacts. She put this person down and said stepfather. Now, that probably wasn't the best choice of words to use in this document that's filed at the school and is not going to be seen by anyone except for people at the school unless you're in custody or visitation litigation. But that's what she put on there. I don't see how that can be interpreted as taking actions not likely to encourage a relationship between Mr. Griffin and the minor child. Not including Mr. Griffin in therapy. How did Mrs. Griffin not include the minor child in therapy? This is the first thing I thought when I read that. I think we can't take Mr. Griffin's affirmative inaction of not participating in therapy. And you have to remember that this is a man who talked about his close relationship with his daughter. And when he has his daughter for visitation, he spends all of his time with her. He was making a big thing in the trial about he doesn't put her off on babysitters. He doesn't go spend time with a girlfriend accusing Mrs. Griffin of spending too much time with her boyfriend. He spends all the time with his daughter. Well, I think you could reasonably assume that his relationship was as close as he said. Why did he know that this child was going to this therapist for all these years, especially after he went to the first three meetings? And again, we go back to this comment that the court made accusing Mrs. Griffin of taking actions not likely to encourage a relationship with the child. The testimony showed that while this action was pending, there was a change in Mr. Griffin's work schedule. And the visitation schedule that was originally part of the joint pairing agreement that was incorporated into the judgment for disillusion of marriage was no longer feasible. So Mrs. Griffin, without a court order, without the lawyers involved, without the court involved, worked it out with her husband to provide him the time while this case was pending so he wouldn't lose any time. If anything, that shows Mrs. Griffin attempting to encourage a relationship between the daughter and doing everything she can to do what you're supposed to do as a mother with your child and your daughter. Another issue. Mr. Griffin never raised this issue of Mrs. Griffin taking actions not likely to encourage their relationship. In fact, the only evidence that I saw was this issue of Mr. Griffin making this little girl feel guilty, indicating that she did not love him because she wanted to see her mother more. So in looking at the law about a trial like this, because you can't ask the appellate court to retry the case, we can only ask the appellate court to change something if it was that the trial court act arbitrarily in denying the petition to modify visitation based on that evidence they did because there wasn't any other evidence to the contrary except for both parties saying that we love our daughter and we want to have visitation. Was that action without conscientious judgment? To me, that means that did you really think about it or did you kind of just do this and look at the evidence in view of all the circumstances that this ruling exceed the exceed the bounds of reasons? I think it did. I think it exceed the bounds of reason that ignore the recognized principles of law recognized principle of law when dealing with visitation is what is in the best interest of the child. All the evidence showed that it's in the best interest of the child to change visitation and that it result in substantial injustice to this little girl. I think it did. I thank you very much. I'm not sure I have any questions. Thank you, Mr. Biden. Mr. Bean. Is it Levine? I'm sorry. Judge, I'm listening to Mr. Body. First of all, I would like to say good afternoon to the court and listen to Mr. Body. I tried this case with Mr. Body and it certainly doesn't sound like the case I heard, but I would suggest to the court a number of things in rebuttal to what Mr. Body said. First, the issues in this case is, first of all, a petition. The parties agreed originally to a joint parenting agreement in which certain facts were not in dispute and were part of the joint parenting agreement. The parties live in the exact same place that they lived at the time the joint parenting agreement was negotiated and that was back in 05. My client lives in Indiana about 22 miles from St. Laborious, the school that this young lady attends. And Mrs. lived about three miles. For a period of three years between 05 and 08, my client is a pharmacist. He has certain hours that he works and this particular schedule was designed and was put into place so that each of the parties would have equal time with their daughter. And frankly, that's exactly what's happened and it's continuing to happen in 2011. For six years this has occurred. At the three year period, a petition is filed by Mrs., which you've got to read the petition. The petition is fraught with all kinds of allegations of alcoholism, drinking in the presence of the child, and a number of and in its original form actually asked to sever the joint parenting agreement. However, we filed a motion to dismiss and the court dismissed the provisions with reference to the severance of the joint parenting and left it at visitation. At no time were the allegations in the petition withdrawn and these allegations were replete with all kinds of bad things that they said my client was doing. Not one scintilla of evidence was produced at the trial to back up any of those allegations, although we prepared for it. It ended up in a situation where it was strictly a best interest issue. Judge Archambault listened to the testimony of a social worker, Boxstaller, who in three years of therapy with this child never once attempted to communicate with my client. We don't know, and my client doesn't quiz his daughter, whether in fact he ever knew she was in therapy at all. You would think if this was that you might call dad at any time between 05 and 08 and say, you know what? There's a problem here. You should come in and talk either conjointly together with both parents or talk to me because I'm a little concerned. My client never was informed nor was he any time in the loop with reference to social worker Boxstaller's therapy with the child. She testified at the trial and I asked her pointedly. I said, Ms. Boxstaller, Dr. Boxstaller, why in the world would you not bring dad in if you thought it was a problem and attempt to resolve it so we don't have to be in court? Her answers are in the record. Well, Mrs. is the person that hired me. I never was told by mom to get a hold of dad. Well, that's not therapy. She came in and testified without ever having talked to dad except for three occasions at the beginning of this case when I think the parties were attempting to they had just separated. So her testimony, if you look at it, is, to me, inconclusive and certainly not compelling. Joseph Glimko, the attorney for the GAL in this case, did do an evaluation. As Mr. Bonney so indicated and rightly so, the court's not bound by the GAL's recommendation. The court's the one that observes the demeanor of all the parties. The court's the one that checks the credibility of the witnesses, and I'll get to that in a minute. The court is the one that has the opportunity to observe. And yes, I was the one that wanted the child to talk to the judge because I felt that all the evidence had to come in before the judge made the decision. She didn't have to hear it from the GAL. She didn't have to hear it from social worker Box Dollar. She could hear it from the child. Well, she did. She listened to what the child said. She then heard the testimony of both parties and found specifically in the order that Mrs. Mary Ellen Griffin was not credible. And you had the record does not you had to be there to hear her testimony to understand why the judge ruled that way. She was evasive. When I asked her a simple question like, isn't this an equal division of time for the daughter between you and your husband? She wouldn't answer. She danced around it. She did the same thing by having her boyfriend referred to as stepdad or dad by the child. The judge got a good feel for all of these witnesses for Mr. Griffin, for Mrs. Griffin, for the GAL. And the judge wrote what I believe was a well-reasoned decision in which she took all of this evidence into intellect. There was nothing that the judge ignored. And frankly, I felt that the best way to try this case was to let everything in so that the judge could look at it and make a decision. This denial was not an abuse of the court's discretion. The court has broad authority, and you can't say that any other reasonable judge wouldn't have come to the same conclusion. It applied the best interest test. The court looked at each of the factors. The court reviewed the witnesses and heard each of their testimony. Had an effort and weighed, as I said, their credibility. The judge heard my claim. A most concerned dad who spends every other week with his daughter and has done so for years. The court heard that the only time the child was ever tardy from school was when mom took the child or when mom couldn't get the child to school because she overslept. In three or four years, through snow and wind and rain, my client got the child to school every single day on time. There was never one tardy. All of these factors, the child was in various extracurricular activities. He brought that child to every single activity and never missed. He prepared meals for the child. He spent and is given a good deal of his whole life to her best interests. And the court got that feeling. You had to hear my client testify in the sincerity in which he did so that you could judge his credibility. And she judged his credibility as far greater than Mary Ellen. I would suggest to the court that this particular, we are not here to retry this case in front of you. We are here to ask you to look at the judge's order. And she wrote it out. It was an order of some nine pages. Nine pages. In which she set forth exactly what law she applied, exactly what every single thing that occurred, she took it all into consideration. And it's interesting to note that when she ruled. And she ruled on a best interest, taking into account all of these, all of this testimony and all of the factors in 602A. She listed them out. She found particularly that mother's credibility is questionable and that her willingness and ability to facilitate and encourage a close and continuing relationship with the child, number eight of 602.1, was not being followed by Mrs. And in fact found that she was making efforts to interfere with this relationship and that this particular petition and the child's wishes were basically coming from her mother. I would indicate to the court in reading it, read the court's reading it, and I think the court was justified in making the decision. It certainly was not a decision which was an abuse of her discretion. Everything was considered a well-reasoned decision denying the petition. Thank you. Mr. Body. Thank you. The first issue I wanted to address is the standard for visitation because we're not looking at what the original schedule was and it's not a substantial change in circumstances like we're modifying custody. It's what's in the best interest of the child. It's not the schedule of the parents or the parties that what the court is supposed to look at. It's what's in the best interest of the child and they made the schedule originally around Mr. Griffin's work schedule when the minor child was small. But if that does not become what's in the best interest of the child anymore, work schedule or no work schedule, that's not what we should do to this little girl. It should be what's in her best interest. Relative to that, Mr. Body, I'm looking for either evidence directed at the allegations in the petition or other evidence that this child has missed out on opportunities or has suffered lost grades or is somehow suffering because of the visitation and the joint parenting time as it is currently. Other than she says, hey, I want to sleep later and I want to be by my friends, which I don't know that during weeknights, school nights, that 9 and 10 year olds are spending a lot of time with friends. I'm just wondering what is it that is not in her best interest about this situation? She wasn't participating in any extracurricular activities at the time of the trial like she had been in prior years. I think she played volleyball and she was no longer playing any, there's no extracurricular activities. I think that may answer your question as to one item right there. But didn't she say that it was not, I mean, she had done it in the past and that she had thought maybe about taking TEMLI, but it had nothing to do with not being allowed to or not being able to. I'm not certain. Maybe she just, maybe one of the reasons she didn't like it was because it was so difficult for her to travel back to dad's house or this person pick you up and that pick you up. It probably would cause a minor child or any child not to want to do it anymore because it's just too hard. Did she say that? I don't think she did say that. I don't think she said it. I think you could, you know, she just said she wasn't doing it anymore. So you're just guessing? I'm just, no, I'm not guessing. I wouldn't say guess. I would say I'm just reasonably assuming that that's likely that a child, and I'm just putting myself there. I mean, all of a sudden, well, if I have to go out to court, go after school, then I have to go to an activity and then I have to wait till dad picks me up this day. Mom picks me up this day. Then I have to go back and I get home late. I mean, it just, it just seems to me something that wouldn't be conducive to her best interests. Another thing that we do is we do a lot of trial lawyers. And I try a lot of cases. What we're supposed to do is evaluate the evidence and present to the court the competent evidence that when you have issues, he said, she said, and you have all this other evidence at GAL and you have everything else. You don't want to put on the he said, she said. Those are tactical decisions you make. I don't think it should be held against someone for not putting in evidence that was in an original petition. Okay. Another thing is just why I think the court's findings, they mentioned the fact that Mr. Levine asked her and she denied that the original parent in time was equal. That's not what she denied. If you look at the exact question he asked his question and I'll quote it. You and Kevin, meaning Mary Ellen and Mr. Griffin worked out a schedule wherein you agree that the child could essentially be with him 50% of the time and you 50% of the time. Is that correct? And she said no. And then she went on to say no. The question was just asked for the person that she was referring to. Jack, the rep will show the person was the mediator, the mediator. They didn't agree the mediator. She, in her mind, the mediator set this out and that's what she did. She wasn't being evasive. If you look at her questioning and it's on the record at page 797, you'll see her answers. And she even mentions, no, it was jacket. We didn't agree. It was Jack. So again, I don't think that the court, uh, I just think they made the wrong call when they were talking about the credibility of Mrs. Change. And the people that were involved in this case substantially all said the same thing, including, and I thank you very much. Thank you, Mr. Buddy. And thank you both for your argument today. We will take this matter under advisement and get back to you with a written decision within a short day. And we'll now take a, uh, lunch and recess. But there isn't a